**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ATRIUM HEALTH CAROLINAS MEDICAL CENTER**<br>1000 Blythe Blvd<br>Charlotte, NC 28203<br><br>Plaintiff,<br><br>v.<br><br>**XAVIER BECERRA,** In his Capacity as Secretary of the U.S. Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br><br>Defendant. | ) | Case No. |

**COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT**

**JURISDICTION AND VENUE**

1. This is a civil action brought to obtain judicial review of final decisions rendered on April 14, 2023, by the Provider Reimbursement Review Board ("PRRB"), acting as a component of the United States Department of Health and Human Services ("HHS"). The decisions for which judicial review is hereby sought are PRRB Case Nos. 14-1203, 14-2767, and 15-2462. Each decision rendered concerns the same appealing Hospital Provider, Plaintiff Atrium Health Carolinas Medical Center.

2. This action arises under Title XVIII of the Social Security Act, as amended (42 U.S.C. §1395 et. seq.), hereinafter referred to as the "Medicare Act" or the "Act", and the Administrative Procedure Act, 5 U.S.C. § 706.

3. This Court has jurisdiction under 42 U.S.C. §1395oo(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1361. Venue lies in this judicial district pursuant to 42 U.S.C. §1395oo(f), and 28 U.S.C. § 1391(e)

4. Provider timely filed its appeal with the Provider Reimbursement Review Board pursuant to 42 U.S.C. §1395oo(a)(3).

5. This civil action is filed within sixty (60) days of the date Provider received the decisions of the Board wherein the Board hereby effectively dismissed each one of Provider's three (3) PRRB case appeals pending before the Board, each such appeal consisting of that same issue; DSH Medicaid Eligible Days. As such, the Board dismissed each such appeal *in its entirety* and removed each such appeal from the Board's docket", based upon, among other groundless contentions, the Provider's failure to meet the Board's requirements for position papers for each such appeal by failing to provide all supporting documents (exhibits) supporting its position as required under 42 C.F.R. §§412.106(b)(4)(iii) and 405.1853(b)(2)-(3) and Board Rules 27.2 and 25.

**PARTIES**

6. Plaintiff, ATRIUM HEALTH CAROLINAS MEDICAL CENTER (Medicare Provider Number 34-0113) files this appeal from the final decisions of the PRRB dated April 14, 2023, dismissing each of Plaintiff's three appeals, Case Nos. 14-1203, 14-2767, and 15-2462. The subject of the appeals to the PRRB concern Fiscal Years Ending ("FYE") December 31, 2008, December 31, 2009, and December 31, 2011.

7. Plaintiff named herein (hereinafter, "Plaintiff," "Plaintiff Provider" or "Provider") is an acute care, in-patient healthcare facility that serves a disproportionate share of low-income patients. At

all relevant times, Plaintiff Provider had a Medicare provider agreement with the Secretary of Health and Human Services and was eligible to participate in the Medicare program.

8. As set forth more fully below, Plaintiff objects to each of the dismissals of its appeals by the PRRB as arbitrary, capricious and a violation of the rightful and allowable claims of Plaintiff.

9. Defendant, Xavier Becerra, Secretary of the U.S. Department of Health and Human Services ("Secretary"), or his predecessors in office, is the federal officer responsible for the administration of the Medicare program. Defendant Becerra is sued in his official capacity.

**MEDICARE STATUTORY AND REGULATORY BACKGROUND**

10. The Medicare program was established to provide health insurance to the age and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (HHS) charged with administering the Medicare program.

11. Medicare reimburses the operating costs of inpatient Provider services primarily through the Prospective Payment System (PPS). 42 U.S.C. §1395ww(d). The PPS statute contains a number of provisions that adjust reimbursements based on Provider- specific factors. See 42 U.S.C. §1395ww(d)(5). This case involves the Provider-specific disproportionate share (DSH) adjustment, which requires the Secretary to provide increased PPS reimbursement to Providers that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).

12. Whether a Provider qualifies for the DSH adjustment, and how large an adjustment it receives, depends on the Provider's "disproportionate patient percentage (DPP)." 42 U.S.C. § 1395ww(d)(5)(F)(v). The DPP is the sum of two fractions, the "Medicare and Medicaid fractions," for a Provider's fiscal period. 42 U.S.C. §1395ww(d)(5)(F)(vi). Providers whose DSH percentages

meet certain thresholds receive an adjustment which results in increased PPS payments for inpatient Provider services. 42 U.S.C. §1395ww(d)(5)(F)(ii).

13. The first fraction's numerator is the number of Provider patient days for such period who (for such days) were entitled to both Medicare Part A and Supplemental Security Income (SSI) benefits, and the denominator is the number of patient days for patients entitled to Medicare Part A. Id.

14. The second fraction's numerator is the number of Provider patient days for patients who (for such days) were eligible for medical assistance under a State Plan approved under Title XIX for such period but not entitled to benefits under Medicare Part A, and the denominator is the total number of the Provider's patient days for such period. Id. The second fraction is frequently referred to as the Medicaid fraction. It is the Medicaid fraction which is the focus of each of the PRRB appeals erroneously dismissed by the Board.

15. The SSI program is administered by the Social Security Administration (SSA); therefore, identifying patients who were entitled to SSI during their Providerization requires access to SSA's SSI data. To implement the DSH legislation, the number of patient days for those patients entitled to both Medicare Part A and SSI is determined by matching data from the MEDPAR file, which is Medicare's database of Provider inpatients, with a file created for CMS by SSA to identify SSI-eligible individuals.

16. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries (hereinafter, the "MAC"). Fiscal intermediaries determine payment amounts due the providers under Medicare law and regulations. 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b). Although the Intermediary calculates the DPP, it is CMS that computes the SSI fraction.

17. At the close of its fiscal year, a provider must submit a cost report to the fiscal Intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal Intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803.

18. A provider dissatisfied with the MAC's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (PRRB) or (Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo(a); 42 C.F.R. §405.1835.

**SPECIFIC FACTS PERTAINING TO THIS CASE**

19. Plaintiff Provider filed three timely and jurisdictionally proper appeals to the PRRB from the MAC's final determinations. The sole issue in each of the three appeals remains the DSH Medicaid Eligible Days for each Stated Provider fiscal year. (2008; 2009; 2011).

20. The dismissals of each of Plaintiff Provider's three appeals are based upon similar determinations by the Board, and are set forth in three separate dismissal letters, each issued by the Board on April 14, 2023, and attached hereto as Plaintiff's Exhibits "1", "2" and "3".

21. The bases for the Board's dismissals were enunciated as the Provider's failure (by and through its duly appointed representative) to provide a Medicaid eligible days listing or other supporting documentation for the Medicaid Eligible Days listing or other supporting documentation for the Medicaid Eligible days issue as required by the controlling regulations at 42 C.F.R. §§ 412.106(b)(4)(iii) and 405.1853(b)(2)-(3) and PRRB Board Rule 25 (as applicable via Board Rule 27.2). Nor, contends the Board, has Plaintiff Provider provided any timely explanation to the Fiscal Intermediary (hereinafter, "MAC") as to why the documentation was absent or what is being done to obtain it, notwithstanding the ages of the cases.

22. In response to the Board's contentions as set forth in Exhibits 1-3, attached hereto, Plaintiff Provider notes that in each appeal, its representative reached out to the North Carolina (State) Department for Medicaid and its duly appointed representatives on numerous occasions covering a span of years while each appeal was pending, seeking to obtain data and patient information through State agency documentation in order to complete the task of providing the Board with the requisite number of patient Medicaid Eligible Days (and in particular, patient days for which a patient was believed to be eligible, but payment had not yet been made, i.e., "Medicaid unpaid eligible days") which are necessary to enable the Provider to compute its DSH calculations, and such information resides only in the custody and control of the Medicaid State agency. Despite its numerous unsuccessful efforts to gain access to such information from the State agency, Plaintiff Provider proceeded to file with the Board timely Preliminary Position and Final Position papers required to proceed forward with each of its Board appeals, but without requisite, completed documentation/exhibits relative to the Medicaid Eligible Days, occasioned solely because the State agency continued to report to Plaintiff Provider's representative a myriad of excuses for delays and non-production of data and documents to Provider, including (a) necessary, older data had been voided from the system, (b) delays in providing updates due to technical issues with the State database, and (c) ongoing system issues at the State agency to which Plaintiff Provider and the State agency continued to work to find alternative methods to fix the deficiencies.

23. Despite all the efforts of Plaintiff Provider to provide the documentation relative to Medicaid Eligible Days to the Board in each appeal, and its good faith requests for postponement of each set hearing date until the documentation issue would be resolved, the Board dismissed each of Plaintiff Provider's appeals at the request of the MAC for such dismissals.

## ARGUMENT

24. Relevant to the issue involved in this case, two Federal programs, Medicaid and Medicare involve the provision of health care services to certain distinct patient populations. The Medicaid program is a cooperative Federal-State program that provides health care to indigent persons who are aged, blind or disabled or members of families with dependent children. The program is jointly financed by the Federal and State governments and administered by the States according to Federal guidelines. Medicaid, under Title XIX of the Social Security Act, establishes two eligibility groups for medical assistance: categorically needy and medically needy. Participating States are required to provide Medicaid coverage to the categorically needy. The "categorically needy" are persons eligible for cash assistance under two Federal programs: Aid to Families with Dependent Children (AFDC) and Supplemental Security Income or SSI. Participating States may elect to provide for payments of medical services to those aged blind or disabled individuals known as "medically needy" whose incomes or resources, while exceeding the financial eligibility requirements for the categorically needy (such as an SSI recipient) are insufficient to pay for necessary medical care. Section 1902(a)(1)(C)(i) of the Act. In order to participate in the Medicaid program, a State must submit a plan for medical assistance to CMS for approval. The State plan must specify, inter alia, the categories of individuals who will receive medical assistance under the plan and the specific kinds of medical care and services that will be covered. *Id.* § 1902 et seq., of the Act. If the State plan is approved by CMS, under section 1903 of the Act, the State is thereafter eligible to receive matching payments from the Federal government based on a specified percentage (the Federal medical assistance percentage) of the amounts expended as medical assistance under the State plan.

25. Section 1902(a)(7)(A) of the Social Security Act provides safeguards that restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with,

inter alia, (A) the administration of the plan. The regulation at 42 CFR 431.302 sets forth the "purposes directly related to State plan administration, which includes: (a) Establishing eligibility. (b) Determining the amount of medical assistance; (c) Providing services for beneficiaries; and (d) Conducting or assisting an investigation, prosecution, or civil or criminal proceeding related to the administration of the plan Section 1903(a)(3) of the Act provides for FFP in State expenditures for the design development or installation of mechanized claims processing and information retrieval systems and others. 42 CFR 433.110. In addition, section 1903(r) of the Act imposes certain standards and conditions on mechanized claims processing and information retrieval systems (including eligibility determination system) in order for these systems to be eligible for Federal funding under section 1903(a) of the Act. The regulation provides for a mechanized claims processing and information retrieval system which includes a "system of systems" developed to support a Medicaid Management Information System (MMIS) and Eligibility and Enrollment (E&E) may be implemented as discrete independent interoperable elements. The MMIS is used to process claims for Medicaid payment from providers of medical care and services furnished to beneficiaries under the medical assistance program and to perform other functions necessary for economic and efficient operations, management and monitoring and administration of the Medicaid program. 42 CFR 433.111(b)(2)(ii).

26. The first computation, the Medicare/SSI fraction is addressed at 42 CFR 412.106(b)(2). The second computation, referred to as the Medicaid fraction, is set forth at 42 CFR 412.106(b)(4) (2004) and provides that the MAC shall determine, for the same cost reporting period used for the first computation, the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A and divides that number by the total number of patient days in the same period. For purposes of this second computation, the following requirements apply:

(i) For purposes of this computation, a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver (ii) Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under paragraph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act; and, (iii) the hospital has the burden of furnishing data adequate to prove eligibility for each Medicaid patient day claimed under this paragraph, and of verifying with the State that a patient was eligible for Medicaid during each claimed patient hospital day.

27. Relevant to this case, section 951 of the Medicare Prescription Drug, Improvement, Modernization Act of 2003 (MMA) (Pub. Law 108-173) set forth, effective December 8, 2003, the following provision:

Furnishing Hospitals with Information to Compute DSH Formula

> "Beginning not later than 1 year after the date of the enactment of this Act, the Secretary shall arrange to furnish to subsection (d) hospitals (as defined in section 1886(d)(1)(B) of the Social Security Act, 42 U.S.C. 1395ww(d)(1)(B)) the data necessary for such hospitals to compute the number of patient days used in computing the disproportionate patient percentage under such section for that hospital for the current cost reporting year. Such data shall also be furnished to other hospitals which would qualify for additional payments under part A of title XVIII of the Social Security Act on the basis of such data."

28. In implementing this provision of the law, the Secretary stated the following in the Federal Register publication of the "Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates" (Aug. 12, 2005):

> "In the FY 2006 IPPS proposed rule (69 FR 23434), we proposed to implement a mechanism for implementing section 951 of Pub. L. 108-173, which requires the Secretary to arrange to furnish the data necessary for hospitals to compute the number of patient days used in calculating the disproportionate patient percentages. The provision is not specific as to whether it applies to the patient day data used to determine the Medicare fraction or the Medicaid fraction. We interpret section 951 to require the Secretary to arrange to furnish to hospitals the data necessary to calculate both the Medicare and Medicaid fractions. With respect to both the Medicare and Medicaid fractions, we interpret section 951 to require CMS to arrange to furnish the personally identifiable information that would enable a hospital to compare and verify its records, in the case of the Medicare fraction, against the CMS' records, and in the case of the Medicaid fraction, against the State Medicaid agency's records." 70 Fed Reg. 47441 (Emphasis added)

29. In discussing the implementation with respect to the Medicaid fraction, the Secretary explained that the numerator of the Medicaid fraction includes hospital inpatient days that are furnished to patients who, for those days, were eligible for Medicaid but were not entitled to benefits under Medicare Part A. Under the regulation at 42 CFR 412.106(b)(4)(iii), hospitals are responsible for proving Medicaid eligibility for each Medicaid patient day and verifying with the State that patients were eligible for Medicaid on the claimed days. The number of Medicaid, non-Medicare days is divided by the hospital's total number of inpatient days in the same period. Total inpatient

days are reported on the Medicare cost report, a number that is also available in the hospital's own records. The Secretary stated that:

> "Much of the data used to calculate the Medicaid fraction of the DSH patient percentage are available to hospitals from their own records or from the States. We recognize that Medicaid State plans are only permitted to use and disclose information concerning applicants and recipients for "purposes directly connected with the administration of the [State] plan" under section 1902(a)(7) of the Act. Regulations at 42 CFR 431.302 define these purposes to include establishing eligibility (§ 431.302(a)) and determining the amount of medical assistance (§ 431.302(b)). Thus, State plans are permitted under the currently applicable statutory and regulatory provisions governing the disclosure of individually identifiable data on Medicaid applicants and recipients to provide hospitals the data needed to meet their obligation under §412.106(b)(4)(iii) in the context of either an "eligibility inquiry" with the State plan or in order to assist the hospital, and thus the State plan, in determining the amount of medical assistance. In the process of developing a plan for implementing section 951 with respect to the data necessary to calculate the Medicaid fraction, **we asked our regional offices to report on the availability of this information to hospitals and on any problems that hospitals face in obtaining the information that they need**. …. There is no uniform national method for hospitals to verify Medicaid eligibility for a specific patient on a specific day…. The information that providers submit to State plans (or third-party contractors) differs among States as well. Most States require the patient's name, date of birth, gender, social security number, Medicaid identification, and admission and discharge dates. States or the third parties may respond with either "Yes/No" or with more detailed Medicaid enrollment and eligibility

> information such as whether or not the patient is a dual-eligible, whether the patient is enrolled in a fee-for-service or HMO plan, and under which State assistance category the individual qualified for Medicaid…" (Emphasis added)

Moreover, and lending further emphasis from CMS that each State Medicaid agency provide assistance to hospital providers in their efforts to retain the necessary documentation and data from them for purposes of providing the essential information to the PRRB, an acting Director on behalf of CMS and the Center for Medicaid and State Operations asked each State Medicaid agency the following:

> "To the extent hospitals may ultimately become entitled to have [the Ruling applied for particular] fiscal periods, the hospitals will have the burden of proving the total number of Medicaid patient days for each fiscal year at issue. Information about Medicaid "paid days" (i.e., days where the State Medicaid plan provided for payment on behalf of the patient) is often available from the hospital's own records. However, in order to establish the number of Medicaid "unpaid days" (i.e., days where a patient was eligible for Medicaid but the State plan did not provide for payment on behalf of the patient), the provider needs information contained in the State's Medicaid eligibility records. CMS requests the full cooperation of the State Medicaid agencies …. in responding to hospital requests for Medicaid eligibility information. Specifically, the States are strongly encouraged to retain Medicaid eligibility records [until the pending Medicare DSH litigation comes to an end], even if current record retention schedules might otherwise allow the earlier destruction of eligibility records." *See,* CMS letter from Acting Director, Family and Children's Health Program Group, Richard Fenton dated September 9, 2003, to Associate Regional

      Administrators, Regions I through X, attached hereto as Exhibits "4.a" and "4.b". (Emphasis added).

30. The takeaway from the Secretary's statements to this point is the recognition that while it is ultimately up to the Provider to acquire, then provide the necessary Medicaid data re: Medicaid Eligible Days for purposes of satisfying its appeals requirements to the Board, it is clear that the Secretary recognizes, through its "ask", that State Medicaid offices take the necessary steps to report the availability of this critical information to hospital Providers as well as difficulties, technical or otherwise, in the State's inability to timely provide such information to CMS and the Board. The Director went on to state, in the appeals case of: *HCA DSH-Colorado State Database Group Appeals vs. Novitas Solutions, Inc.*, PRRB Dec. No. 2016-D17;

> "….We continue to believe hospitals are best situated to provide and verify Medicaid eligibility information. Although we believe the mechanisms are currently in place to enable hospitals to obtain the data necessary to calculate their Medicaid fraction of the DSH patient percentage, there is currently no mandatory requirement imposed upon State Medicaid agencies to verify eligibility for hospitals. At this point, we continue to believe there is no need to modify the Medicaid State plan regulations to require that State plans verify Medicaid eligibility for hospitals. <u>However, should we find that States are not voluntarily providing or verifying Medicaid eligibility information for hospitals, we will consider amending the State plan regulations to add a requirement that State plans provide certain eligibility information to hospitals</u>." 70 Fed. Reg. 47441-47442 (Emphasis added)

The Secretary addressed a third-party commentor's inquiry with respect to the interface of the State plan requirements and Medicaid eligibility data:

"We are dedicated to working with the State Medicaid agencies to ensure that hospitals have access to data to verify Medicaid eligibility. While the commenters expressed concern that some hospitals find it burdensome to adapt the Medicaid eligibility data available from the States to their records, we do not believe these types of data processing concerns are significant enough to warrant changes to the State plan requirements. We are also aware that not all State agencies have the resources available to modify their systems in a standardized way. We note that the Center for Medicaid and State Operations in CMS has communicated CMS' expectation of compliance with hospitals' requests for Medicaid eligibility information to the State Medicaid agencies. <u>If the State Medicaid agencies refuse to provide data to enable hospitals to calculate their DSH Medicaid fraction and meet their obligations under our regulations at §412.106(b)(4)(iii), we will consider amending the Medicaid State plan requirements to require the State agency to release the information to the requesting hospitals.</u> (Emphasis Added) (*See*, *HCA DSH-Colorado State Database Group Appeals vs. Novitas Solutions, Inc.*, p. 14) …. While we are aware that section 951 requires that CMS provide the data necessary for hospitals to calculate their Medicare DSH patient percentage, we stand by our belief that hospitals are in a better position to verify Medicaid eligibility with the State Medicaid agencies through their established mechanisms. Therefore, we believe hospitals have available to them the data necessary to calculate the Medicaid fraction for their Medicare DSH patient percentage. <u>CMS will continue to work with State Medicaid agencies to ensure that Medicaid eligibility information is made available to hospitals</u>. *Id.*

31. The Secretary also addressed a commentor's concerns that some State Medicaid agencies were refusing to provide hospitals with Medicaid eligibility information. The Secretary Stated that:

> "…[w]e are aware that several State Medicaid agencies have previously expressed concern regarding hospital requests for **historic** Medicaid eligibility information. We note that section 2080.18 of the State Medicaid Manual limits the timeframe within which the State Medicaid agencies may provide eligibility information to requesting hospitals. Section 2018.18 clearly specifies that State Medicaid agencies may only provide eligibility information for dates within 12 months of the date of the request. Therefore, many States have expressed concern that responding to requests for eligibility data outside of that 12-month window would be in violation of CMS' policy. In light of past and pending appeals and litigation, we are working with the States to make sure historic information is available to requesting hospitals. The Center for Medicaid and State Operations released a memo to the CMS Regional Offices to be shared with the Medicaid State agencies. This memo, dated September 9, 2003, requested the full cooperation of the State Medicaid agencies in responding to hospital requests for historic Medicaid eligibility information. The States were specifically encouraged to retain Medicaid eligibility records in order to be able to comply with hospital requests for historic data, even if their normal record retention schedule would have allowed the destruction of such records. CMS' request to Medicaid State Agencies to provide hospitals with historical Medicaid eligibility data represents an exception to the general rule as Stated in section 2080.18 of the State Medicaid Manual intended to assist hospitals to respond to the past and pending appeals and litigation. Fed. Reg. 47442-47443 (*Id.* at p. 16) (Emphasis Added) … the Medicaid State agencies

maintain eligibility information on Medicaid recipients. To date, we have been made aware of accuracy problems as far as the data requested are historic and the complete records may no longer be available. As previously noted, we have requested that the State Medicaid agencies comply with hospital requests for historic data and modify their record retention schedules appropriately. We suggest that hospitals experiencing problems with the quality of current Medicaid eligibility data work with their fiscal intermediaries and State Medicaid agency to address the specific problems the hospital is encountering. (*Id.* at p. 17).

32. As noted within the narrative of each of the Board's dismissal letter (Exhibits 1-3, attached) working through the issues with the North Carolina State Medicaid agency is precisely what Plaintiff Provider through its representative sought to do over a prolonged period of time, but too long for the Board's patience we must presume.

33. Contemporaneous with the instant case filing herein, Plaintiff Provider has filed its Motion for Reinstatement of each of the three appeals subject to this complaint. Within its motion, Plaintiff expresses its difficulties in matching their patients to the State's Medicaid eligibility files for two main reasons: First, it is well-established that North Carolina does not match patients eligible for SSI on the basis of a single, unique identifier. Thus, despite supplying the State with the correct patient Social Security number (SSN), a provider such as Plaintiff will not obtain a 'match' if the Provider's records show the individual as, e.g., "John P. Smith" if the State records show that the SSN belongs to John *Paul* Smith. Second, it has been learned that the State has been purging records from its database; however, Plaintiff by and through its representative did not, and could not have reasonably discovered this fact until 2020 when the State alerted the representative to the purging. Plaintiff's representative sought from the State access to its matching algorithms but was

refused access. Unfortunately for Plaintiff as well as other situated hospital providers, the matching system as a whole is stacked against them because, Plaintiff is informed and believes and thereon alleges, that CMS has the authority, through its own Medicaid regulations, to require States to match on the basis of a single unique identifier and to maintain their records for a sufficient period of time. Plaintiff thereupon alleges that CMS has failed and continues to fail to exercise its regulatory authority.

34. Finally, the Board has alleged in its three separate appeal dismissal letters that Plaintiff Provider failed to set forth explanations in any of the three Final Position Papers an explanation of the efforts its representative made to obtain the State Medicaid Eligibility documents and records, or the near impossibility it encountered to obtain then submit the required documentation due to the deficiencies in the State's matching process, as set forth, above. As its plausible and reasonable excuse, Plaintiff Provider, by and through its representative filed timely Final Position Papers at the outset of the COVID pandemic, in March 2020, and immediately experienced staffing issues at its corporate office which disrupted the orderly flow of work assignments and follow up that it was able to accomplish prior to the pandemic.

35. It is readily apparent that Plaintiff Provider exercised its best judgment and efforts to both file timely Position Papers to the PRRB for each of the three appeals as required by the Board's rules, as well as submit all supporting data and documentation along with those Papers. However, due to the long, and ongoing problems Plaintiff Provider faced, and continues to face with the North Carolina State Medicaid agency in retrieving all the essential State Medicaid eligibility files in order to thereafter provide the necessary information and documentation to the Board, and through **no fault of its own in its ability to secure the documentation from the State agency**, Plaintiff was not able to provide the necessary documentation to the Board per its rules. For that reason, Plaintiff

sought several continuances of hearing, the last of which was objected to by the MAC, which objection the Board erroneously and unreasonably upheld.

36. Solely because of the actions of the Board in dismissing each of Plaintiff's three appeals, Plaintiff has suffered significant economic damages by being foreclosed from pursuing it DSH reimbursement adjustment payments it so desperately requires in order to appropriately operate its hospital services.

37. Based upon the foregoing, this Court should order the Secretary to remand Plaintiff's DSH Medicaid Eligible Days issue to the PRRB and order that Plaintiff have a reasonable amount of time not to exceed one hundred and eighty (180) days to secure and obtain all the necessary information and documentation relative to this issue from the North Carolina State Medicaid agency, and if unable to retrieve such information and documentation within that period of time, so notify the Secretary of the precise nature of the difficulties in acquiring same, and seeking the Secretary's active's assistance by his intervention with the State agency to find a solution to the delays that meet the Board's satisfaction.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter an order:

1. Ordering the Secretary to remand Plaintiff's appeal for its FYE 2008, 2009 and 2011 for its Medicaid Eligible Days issue in writing to the PRRB, with copy of such writing to legal counsel for Plaintiff, instructing the PRRB (1) to assert jurisdiction over and reinstate each of the appeals of Plaintiff as to this issue, and (2) to issue a letter to Plaintiff and its intermediary no later than thirty days following the date of remand to the PRRB, with copy to legal counsel for Plaintiff, notifying them that the PRRB has asserted jurisdiction over and reinstated each of the three appeals, and scheduling proceedings on the merits;

2. Grant both Plaintiff and the MAC up to one hundred and eighty (180) days to submit any and all additional data and documentation to support their positions at hearing;

3. That this Court shall retain jurisdiction over this case for purposes of enforcement of the Secretary's compliance with this Court's order;

4. That the Secretary agree to offer his reasonable assistance in interacting directly with the State Medicaid agency to enable Plaintiff to obtain the necessary data and documentation should Plaintiff notify the Secretary that despite its best, ongoing efforts, it is unable to secure the requisite data, information and documentation;

5. That the Court award Plaintiff legal fees and costs; and,

6. That the Court award Plaintiff any and all such further relief as the Court may deem just and proper under the circumstances.

Dated: June 14, 2023

Respectfully submitted,

/s/ Alan J. Sedley
ALAN J. SEDLEY, APLC (Bar No. OH0017)
18880 Douglas, Suite 417
Irvine, CA 92612
(818) 601-0098
Attorneys for Plaintiff